UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

O.J., a minor, by and through his father,
M.J.,

        *Plaintiff,*

     v.

CHAPPAQUA CENTRAL SCHOOL
DISTRICT, CHAPPAQUA CENTRAL
SCHOOL DISTRICT BOARD OF
EDUCATION, DR. CHRISTINE
ACKERMAN, Superintendent of
Chappaqua Central School District, in her
individual capacity, and DR. SANDRA
SEPE, Principal of Horace Greeley High
School, in her individual capacity,

        *Defendants.*

No.  24 Civ. 2830

Hon. Nelson S. Roman

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...........................................................................................iii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

    A.    O.J. Freestyles Rap Lyrics at a Friend's Home on a Friday Evening. ........ 3

    B.    Based on False Allegations in Two Anonymous Reports, School District Administrators Require O.J. to Undergo a Psychological Examination. .... 5

    C.    After O.J. Is Deemed "No Threat," School District Administrators Decide to Suspend Him Anyway for Offensive Lyrics He Neither Wrote Nor Rapped. ................................................................................................................. 6

    D.    School District Administrators Newly Justify Their Suspension of O.J., an LGBTQ Teen, on His Use of the Words "Faggot" and "Twinks." ................ 7

    E.    School District Administrators Double Down on Suspending O.J. for His Satirical and Sophomoric Use of the Word "Faggot." ................................... 8

    F.    The "Hate Speech" Suspension Is Chilling O.J.'s Speech and Will Hurt His College Prospects. ........................................................................................ 9

    G.    O.J. Files a First Amendment Lawsuit to Vindicate His Right to Express Himself Outside of School and Protect His Future. .................................. 10

ARGUMENT ............................................................................................................. 11

    I.    The First Amendment Prohibits the School District from Punishing O.J. for Nondisruptive Off-Campus Expression ..................................................... 11

        A.    The First Amendment protects rap lyrics, even if offensive. .......... 12

        B.    School District administrators cannot punish off-campus speech unless it substantially disrupts school or administrators reasonably forecast such disruption. ................................................................. 13

            1.    School officials cannot punish off-campus speech except in rare circumstances. ......................................................................... 14

            2.    The School District experienced no substantial disruption due to O.J.'s lyrics. ........................................................................ 16

3.   The School District could not reasonably forecast substantial disruption due to O.J.'s lyrics. ................................................... 19

II.   O.J.'s Loss of First Amendment Rights and the Suspension's Impact on His College Applications Constitute Ongoing Irreparable Harm.................... 23

III.   The Balance of Harms Favors a Preliminary Injunction. .......................... 24

IV.   The Court Should Waive the Bond Requirement. ..................................... 25

CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Agudath Israel of Am. v. Cuomo,*
   983 F.3d 620 (2d Cir. 2020) ............................................................................... 11, 23

*Am. Civil Liberties Union v. Ashcroft,*
   322 F.3d 240 (3d Cir. 2003) ...................................................................................... 24

*Bethel Sch. Dist. No. 403 v. Fraser,*
   478 U.S. 675 (1986) ...................................................................................................... 14

*C1.G ex rel. C.G. v. Siegfried,*
   38 F.4th 1270 (10th Cir. 2022) ........................................................................... 17, 20

*Cohen v. California,*
   403 U.S. 15 (1971) ......................................................................................................... 12

*Doninger ex rel. Doninger v. Niehoff,*
   527 F.3d 41 (2d Cir. 2008) ......................................................................... 16, 19, 22

*Elrod v. Burns,*
   427 U.S. 347 (1976) ...................................................................................................... 23

*Guiles ex rel. Guiles v. Marineau,*
   461 F.3d 320 (2d Cir. 2006) ...................................................................................... 14

*Hartford Courant Co. v. Carroll,*
   986 F.3d 211 (2d Cir. 2021) ...................................................................................... 24

*Hazelwood Sch. Dist. v. Kuhlmeier,*
   484 U.S. 260 (1988) ...................................................................................................... 14

*Hurdle v. Bd. of Educ.,*
   113 F. App'x 423 (2d Cir. 2004) .............................................................................. 10

*Iancu v. Brunetti,*
   588 U.S. 388 (2019) ...................................................................................................... 12

*Int'l Controls Corp. v. Vesco,*
   490 F.2d 1334 (2d Cir. 1974) .................................................................................... 25

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.,*
   650 F.3d 915 (3d Cir. 2011) (en banc) ................................................................... 21

*Leroy v. Livingston Manor Cent. Sch. Dist.*,
No. 21-CV-6008 (NSR), 2024 WL 1484254 (S.D.N.Y. Apr. 5, 2024) ...................... 18

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
594 U.S. 180 (2021) ............................................................................ *passim*

*Matal v. Tam*,
582 U.S. 218 (2017) ...................................................................................... 12

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) ...................................................................................... 10

*Morse v. Frederick*,
551 U.S. 393 (2007) ................................................................................. 14, 15

*Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*,
523 F.3d 668 (7th Cir. 2008) ....................................................................... 16

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) ............................................................. 11, 24, 25

*Pharm. Soc. of. State of N.Y., Inc. v. N.Y. State Dep't of Soc. Servs.*,
50 F.3d 1168 (2d Cir. 1995) ......................................................................... 25

*RK Ventures, Inc. v. City of Seattle*,
307 F.3d 1045 (9th Cir. 2002) ..................................................................... 12

*Roe v. Chappaqua Cent. Sch. Dist.*,
No. 16 CV 7099 (VB), 2017 WL 4119655 (S.D.N.Y. Sept. 15, 2017)...................... 10

*Texas v. Johnson*,
491 U.S. 397 (1989) ...................................................................................... 13

*Thomas v. Bd. of Educ.*,
607 F.2d 1043 (2d Cir. 1979) ................................................................ *passim*

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)
393 U.S. 503 (1969) .............................................................................. *passim*

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ...................................................................................... 12

## Statutes, Regulations, and Rules

Federal Rule of Procedure 65(a) ....................................................................... 1

Federal Rule of Procedure 65(c)....................................................................... 25

S.D.N.Y. Local Civil Rule 7.1 ........................................................................... 1

**Other Authorities**

Greta Anderson, *Students' Hateful Speech Results in Rescinded Acceptance*, Inside
  Higher Ed (June 4, 2020), https://perma.cc/C6VK-DEHV ..................................... 24

Under Federal Rule of Civil Procedure 65(a) and Local Civil Rule 7.1, Plaintiff O.J. files this Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction against Defendants Chappaqua Central School District and Chappaqua Central School District Board of Education (collectively "the School District"), requiring them to return O.J.'s high school record to the status quo preceding the current controversy by expunging O.J.'s suspension for off-campus "hate speech" from his high school record pending final judgment in this Court.

## INTRODUCTION

O.J. never expected that when he recorded satirical and sophomoric freestyle rap lyrics in a friend's bedroom, he would be risking school suspension or threatening his college prospects. Without O.J.'s knowledge, his recorded lyrics were combined with those of another teen and the song was posted on SoundCloud. Ten days after the recording, word of the song reached School District administrators through two anonymous reports. The administrators then suspended O.J. for his off-campus speech. But the First Amendment protects the right of public high school students, like O.J., to express themselves on their own time and outside of school—and even more so where, as here, their artistic speech is unrelated to school and does not disrupt school.

Compounding the injustice, O.J. identifies as LGBTQ, and School District administrators only identified two words in his lyrics—"faggot" and "twinks"—that resulted in his suspension for "hate speech." O.J. told administrators about his

1

LGBTQ identity. He informed them that "twinks" is not a slur. And he explained that he used the word "faggot" to reclaim the word, as opposed to those who had previously used it to insult him. In response, the administrators claimed that the context and location of his speech "doesn't matter" because "there are significant limitations on free speech in this country." *See, e.g.*, Verified Compl. ¶¶ 119–20, 134.

The administrators' intransigence surprised O.J. and his father. Two years earlier, the Supreme Court had held that school officials cannot punish a student's off-campus speech unless it causes actual or reasonably foreseeable substantial disruption at school. *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 192–94 (2021). In *Mahanoy*, the Court invalidated punishment for a public high school student's off-campus social media post ("Fuck school fuck softball fuck cheer fuck everything") because there was no evidence of substantial disruption or foreseeable substantial disruption. *Id.* at 185, 192–93. Even after O.J., his father, and his attorneys informed the School District of the Supreme Court's ruling, administrators refused to rescind the suspension.

The School District has shown no concern for established law, or that its punishment is chilling O.J.'s First Amendment right to speak freely off campus, or that it is endangering his future. He will be applying to colleges this fall, and applications require him to disclose his "hate speech" suspension. This Court should require the School District to expunge the suspension from O.J.'s student records to protect his rights and his educational and professional prospects. O.J. does not lose

his First Amendment right to speak outside of school by virtue of being a student—a fact his school should finally be required to recognize.

## STATEMENT OF FACTS

**A.      O.J. Freestyles Rap Lyrics at a Friend's Home on a Friday Evening.**

O.J. is a junior at Horace Greeley High School in Chappaqua, New York. Verified Compl., Doc. 11, ¶ 14. He is an LGBTQ teen active in political causes concerning civil rights. *Id.* ¶ 15. He has addressed his town's board meeting about First Amendment issues and raised thousands of dollars to support groups dedicated to promoting racial equality and civil rights. *Id.* Like millions of high school students, O.J. also enjoys expressing himself through music and spending time with friends. *See id.* ¶ 33.

On the evening of Friday, October 7, 2022, O.J. went to his friend J.M.'s house to hang out. *Id.* ¶ 34. In J.M.'s room, they tried out J.M.'s new microphone and recorded freestyle rap lyrics. *Id.* ¶¶ 36, 38. O.J. freestyled lyrics mimicking the style of "meme rap," a subgenre of hip-hop music. *Id.* ¶¶ 36–37. Meme rap parodies elements of traditional hip-hop by using rhyming verse, sophomoric humor, and deliberately transgressive content. *Id.* ¶ 37.

In keeping with the meme-rap style, O.J.'s freestyled lyrics referenced hot-button topics. *Id.* ¶ 40. For example, his lyrics referenced *Dahmer*, one of Netflix's all-time most-watched series about the notorious serial killer. *Id.* ¶ 41. He rapped that he and Jeffrey Dahmer would "split a bottle of beer" and "fuck a couple of twinks." *Id.* ¶ 43; *see also id.* ¶¶ 48–49 (citing dictionary defining "twink" as "a gay man who is young, slim, and looks like a boy"). O.J.'s lyrics also included the nonsensical lines:

"Faggot, fart, balls. Faggot, fart, balls." *Id.* ¶ 43. As the lines demonstrate, O.J. did not direct the word "faggot" toward anyone or otherwise denigrate members of the LGBTQ community. *Id.* ¶¶ 46–47. Instead, O.J. intended to take the sting out of the term, which others had previously used to shame him, by redeploying it in a new way. *Id.* ¶¶ 46–47. His lyrics said nothing about his school or anyone in his school community. *Id.* ¶¶ 43, 45. After freestyling the lyrics, O.J. left J.M.'s bedroom to hang out with other friends. *Id.* ¶ 38.

That evening, J.M.'s friend T. also recorded freestyle rap lyrics in J.M.'s bedroom. *Id.* ¶¶ 35, 50–52. T. is not a School District student. *Id.* ¶ 35. T.'s separate lyrics, also in meme-rap style, included the words "nigga," "December's killing spree," "rape" a "Chappaqua mom," "beaner monkey I'm gonna whack," and "I'm going to kill Joe Biden and Hillary Clinton." *Id.* ¶ 51. O.J. did not write or rap any of T.'s lyrics. *Id.* ¶ 52.

Sometime later, and unbeknownst to O.J. at the time, J.M. took some of O.J.'s recorded lyrics and combined them with T.'s lyrics to create a song, which J.M. titled "I am Jeffrey Dahmer." *Id.* ¶¶ 53, 57. J.M. posted the song on SoundCloud, a music streaming service that allows users to upload and share their own audio tracks. *Id.* ¶¶ 54–55. O.J. did not participate in, consent to, or know at the time of J.M.'s creation of the song or posting it online. *Id.* ¶¶ 56–58. Nor did O.J. distribute the song to anyone, at his high school or otherwise. *Id.* ¶¶ 61–62. And nothing came of it. No disruption at school ensued—no protest, no taking up class time, no assemblies devoted to discussing the song. *See id.* ¶¶ 5–6. Ten days after the gathering at J.M.'s

house, School District administrators learned of the song only because of two anonymous reports via the School District's website. *See id.* ¶¶ 6, 65, 68.

**B.   Based on False Allegations in Two Anonymous Reports, School District Administrators Require O.J. to Undergo a Psychological Examination.**

On October 17, the School District received two anonymous reports about the song through its "Anonymous Alerts" website form. *Id.* ¶¶ 64–67; M.J. Decl. ¶ 3, Ex. A (the two anonymous alerts). The first reported the song as "Hate Actions/Speech (Racial, Ethnic, & Hurtful Comments)" and included a link to the song on SoundCloud. Verified Compl. ¶ 66. The second report labeled the song as "Threats or Violence" and quoted a few of T.'s lyrics. *Id.* ¶ 67. It also incorrectly suggested that O.J. had rapped T.'s lyrics. *Id.*

That evening, O.J.'s father received a surprise phone call from Principal Sepe asking him and O.J. to attend a "safety meeting" the next morning. *Id.* ¶¶ 68–71. O.J. and his father readily agreed. *Id.* ¶ 72.

On the morning of October 18, O.J. and his father met with Principal Sepe and other school administrators. *Id.* ¶ 73. None of the administrators present had listened to the song. *Id.* ¶ 75. And by this point, J.M. had already deleted the song from SoundCloud. *Id.* ¶ 76. O.J. told the administrators that he had freestyled some lyrics at a friend's house. *Id.* ¶ 78. He also willingly submitted to the administrators' demand that he undergo an immediate "danger assessment" by the school psychologist. *Id.* ¶¶ 79–85.

Dr. Stephanie Lia performed the assessment after the "safety meeting." *Id.* ¶¶ 79–80. She concluded that O.J. had not made any threats, posed no threat to himself or others, and could return to class. *Id.* ¶¶ 81–85; M.J. Decl. ¶ 4, Ex. B (danger assessment form). On the six-page assessment form, Dr. Lia noted that O.J. had not written any of the "disturbing lyrics" other than "the one about men" (referring to O.J.'s lyric about having sex with "twinks"). Verified Compl. ¶ 82. Of the four different threat levels on the form—high, medium, low, or no threat—Dr. Lia concluded that O.J. posed "no threat." *Id.* ¶ 81. An assistant principal and counselor signed off on Dr. Lia's findings. *Id.* ¶ 80. O.J. returned to class for the rest of the school day. *Id.* ¶ 85.

## C.    After O.J. Is Deemed "No Threat," School District Administrators Decide to Suspend Him Anyway for Offensive Lyrics He Neither Wrote Nor Rapped.

O.J. thought this would be the end of the story. But Principal Sepe decided to suspend him for using offensive language, even though O.J.'s speech occurred off-campus, on his own time, and had nothing to do with school. *Id.* ¶¶ 86–87. Later that day, O.J.'s father received a hand-delivered letter from Principal Sepe explaining O.J.'s suspension. *Id.* ¶¶ 91–96; M.J. Decl. ¶ 6, Ex. D (October 18, 2022 suspension letter); *see also* M.J. Decl. ¶ 7, Ex. E (October 21, 2022 revised suspension letter). The letter cited only T.'s lyrics—which O.J. neither wrote nor rapped—to justify the suspension. Verified Compl. ¶¶ 92–93. She accused O.J. of "participat[ing] in singing the song." *Id.* ¶ 92. In her eyes, this merited a three-day suspension. *Id.* ¶¶ 95–96.

As Principal Sepe and an assistant principal explained to O.J. and his father the following day, School District policy authorized them to punish "hate speech" regardless of context, whether or not there is a victim, and even when the speech occurs "beyond school property or outside of a school function." *Id.* ¶¶ 98, 102–04, 119–121; M.J. Decl. ¶ 5, Ex. C (Student Code of Conduct).

## D.   School District Administrators Newly Justify Their Suspension of O.J., an LGBTQ Teen, on His Use of the Words "Faggot" and "Twinks."

O.J. and his father met with Principal Sepe and an assistant principal the next day, October 19, to contest the suspension. *Id.* ¶¶ 105–06. First, the administrators accused O.J. of saying "the n-word" and "faggot" in the song. *Id.* ¶ 109. The administrators had obtained a copy of the song and played it for O.J. and his father. *Id.* ¶ 113. The audio demonstrated that T., not O.J., had said "nigga." *Id.* ¶¶ 111, 114. O.J. further explained that he never uses the n-word and had not used it in his lyrics. *Id.* ¶¶ 110–11. As the song played, O.J. continued to point out which lyrics were his (identifiable by his voice, including the lyrics with the words "faggot" and "twinks") and which were not his (identifiable as a different voice rapping the lyrics cited in the suspension letter). *Id.* ¶¶ 113–14; *see also id.* ¶¶ 125, 127.

None of this moved Principal Sepe, who then pivoted to insist that O.J.'s use of the words "faggot" and "twinks" qualified as "hate speech" and justified his suspension. *Id.* ¶¶ 115–20, 124, 127. In response, O.J. explained his LGBTQ identity and that his classmates had denigrated *him* as a "faggot." *Id.* ¶ 112. He challenged Sepe's suspension based on his mere utterance of the word "faggot" in the nonsensical line "Faggot, fart, balls." *See, e.g.*, *id.* ¶ 112; *see also id.* ¶ 43. O.J. also explained that

7

"twink" is not a derogatory term. *Id.* ¶ 116. The administrators responded that context and the lack of any victim "doesn't matter," and that they had the authority to punish "hate speech" occurring anyplace and anytime. *Id.* ¶¶ 119–21.

While Principal Sepe said that she understood O.J.'s actual role in the song, and the assistant principal offered to rewrite the suspension letter to reference only O.J.'s own lyrics, *id.* ¶¶ 125, 127, they suspended O.J. under the School District's "hate speech" policy anyway. *Id.* ¶ 125. O.J. served a three-day suspension beginning that day, October 19. *Id.* ¶¶ 96, 128; Ex. E at 1.

### E.   School District Administrators Double Down on Suspending O.J. for His Satirical and Sophomoric Use of the Word "Faggot."

O.J. and his father continued to fight the suspension and sought more information, but to no avail. Verified Compl. ¶¶ 128–59. For example, O.J. submitted a written statement explaining his confusion at the accusation that his use of the word "faggot" was "hate speech," given that he identified as a member of the LGBTQ community. *Id.* ¶ 137, 142. And in another meeting with administrators, O.J.'s father again explained that his LGBTQ son's use of the word "faggot" was not intended as "hate speech." *Id.* ¶ 135. Principal Sepe again insisted that using the word "faggot," no matter what, violated the School District's "hate speech" policy and deserved to be punished. *Id.* ¶ 136.

She further refused to rescind the suspension even though the song—let alone O.J.'s lyrics—had not caused any disruption at school. *See id.* ¶¶ 147–48. In a meeting with O.J.'s father on October 26—almost three weeks after the gathering at J.M.'s house, and over a week after administrators learned of the song—an assistant

superintendent conceded that, besides the two anonymous website complaints, the School District knew of only one in-person complaint from a student. *Id.* ¶ 147.

Over the next eight months, O.J. appealed his suspension to Principal Sepe, Superintendent Ackerman, and the School Board. *Id.* ¶¶ 150–59. The School District denied all appeals. *Id.*; M.J. Decl. ¶ 8, Ex. F (June 23, 2023 denial of appeal).

## F.    The "Hate Speech" Suspension Is Chilling O.J.'s Speech and Will Hurt His College Prospects.

O.J. fears expressing himself as an LGBTQ teen because of the suspension. Verified Compl. ¶¶ 169–71. Any future violation of the "hate speech" policy could now cause O.J. to receive a more severe form of punishment. *Id.* ¶¶ 166–68. Fearing this additional and more severe discipline, O.J. self-censors speech about his sexuality because administrators may again construe his words out of context and consider them hateful. *Id.* ¶ 161. He also refrains from expressing himself artistically for fear of being further branded as someone who engages in "hate speech." *Id.* ¶¶ 163, 203.

In addition, O.J. will be required to either disclose his "hate speech" suspension on college applications or refrain from applying to certain institutions, harming and limiting his opportunities. This fall O.J. plans to apply to college programs in design, education, and environmental science at the State University of New York School of Environmental Science and Forestry, Rhode Island School of Design, Brown University, Paul Smith College, and Westchester County Community College. *Id.* ¶ 169. The applications require O.J. to disclose his three-day suspension, and some require that he explain the basis for the suspension. *Id.* ¶ 170.

**G.**     **O.J. Files a First Amendment Lawsuit to Vindicate His Right to Express Himself Outside of School and Protect His Future.**

On April 16, 2024, O.J. filed his verified complaint alleging constitutional rights violations against the School District and the School Board, as well as Superintendent Ackerman and Principal Sepe in their individual capacities. Verified Compl. ¶¶ 172–248. The claims include: (1) a First Amendment claim against Sepe and Ackerman; (2) a First Amendment retaliation claim against Sepe and Ackerman; (3) a *Monell*-based First Amendment claim against the School District and Board;[1] (4) a First Amendment overbreadth claim against the School District and Board; and (5) a Fourteenth Amendment vagueness claim against the School District and Board. *Id.* O.J. seeks damages, a declaration that the Student Code of Conduct's "hate speech" policy is unconstitutional, and an injunction expunging the suspension from O.J.'s educational record and prohibiting enforcement of the "hate speech" policy. *Id.*

This motion for a preliminary injunction seeks only the relief most urgently needed before he completes college applications in the fall—a preliminary injunction requiring the School District to expunge the suspension from his academic record. Accordingly, this Court need only assess O.J.'s likelihood of success on the merits for Claim Three.

---

[1] The School District and Board are municipal entities subject to suit for the acts of their employees pursuant to municipal policies under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See Roe v. Chappaqua Cent. Sch. Dist.*, No. 16 CV 7099 (VB), 2017 WL 4119655, at *7–8 (S.D.N.Y. Sept. 15, 2017); *see also Hurdle v. Bd. of Educ.*, 113 F. App'x 423, 424–25 (2d Cir. 2004).

## ARGUMENT

O.J. is entitled to a preliminary injunction requiring the School District to expunge the "hate speech" suspension from his educational record because he can demonstrate (1) a likelihood of success on the merits, (2) irreparable harm absent injunctive relief, and (3) that the public interest weighs in favor of granting the injunction. *See Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (ordering preliminary injunction in a First Amendment case). In First Amendment cases, "likelihood of success . . . is the dominant, if not the dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (reversing district court's denial of preliminary injunction in First Amendment case).

Here, the School District violated the First Amendment when it punished O.J.'s protected off-campus speech even though it caused no actual or reasonably foreseeable substantial disruption at school. The punishment has chilled O.J.'s protected expression and will hurt his college prospects. The Court should require the School District to expunge the suspension, thereby allowing O.J. to apply to college without having to explain that the School District suspended him for "hate speech."

## I. The First Amendment Prohibits the School District from Punishing O.J. for Nondisruptive Off-Campus Expression.

The School District's administrators had no authority to suspend O.J. for freestyling rap lyrics off campus that were unrelated to his school and caused no actual or reasonably foreseeable disruption at school. As an initial matter, the First Amendment protects musical expression, including offensive or vulgar rap lyrics. Students do not lose that general protection by virtue of being students, whether on

or off campus. And in only rare circumstances may schools regulate off-campus student speech. *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 189 (2021); *Thomas v. Bd. of Educ.*, 607 F.2d 1043, 1049–52 & n.17 (2d Cir. 1979). Because those circumstances are absent here—O.J.'s lyrics did not substantially disrupt his school's learning environment and the administrators could not reasonably forecast that they would—the School District's suspension violates the First Amendment.

### A.     The First Amendment protects rap lyrics, even if offensive.

The First Amendment protects O.J.'s rap lyrics no less than it protects the rap lyrics of Eminem, Cardi B, or Snoop Dogg. "Music, as a form of expression and communication, is protected under the First Amendment." *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989). Rap music receives the same protection. *See, e.g.*, *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1062–63 (9th Cir. 2002).

Rap lyrics that include offensive words receive equal First Amendment protection. After all, "one man's vulgarity is another's lyric." *Cohen v. California*, 403 U.S. 15, 16, 26 (1971) (holding that First Amendment protected wearing jacket with the expression "Fuck the Draft," even if offensive); *see also, e.g.*, *Iancu v. Brunetti*, 588 U.S. 388, 390 (2019) (same with a clothing brand's trademark "FUCT"). That remains true even if those offensive words are believed (correctly or not) to denigrate a person or group. *See Matal v. Tam*, 582 U.S. 218, 228, 233, 243, 247 (2017) (holding First Amendment protects Asian-American rock band The Slants' right to trademark their name—an ethnic slur the band sought to reclaim—and striking down as viewpoint discriminatory a prohibition on trademarks that "disparage the members

of a racial or ethnic group"). While "thoughtful persons can agree or disagree" with efforts to reclaim offensive words, government officials cannot ban their use. *Id.* at 251 (Kennedy, J., concurring). Put simply, the First Amendment prohibits suppressing speech because it expresses ideas that are "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *accord Mahanoy*, 594 U.S. at 205–06 (Alito, J., concurring) (applying principle to student's off-campus speech).

### B. School District administrators cannot punish off-campus speech unless it substantially disrupts school or administrators reasonably forecast such disruption.

O.J. does not lose First Amendment protections by virtue of being a high school student. And his school's authority to punish his non-disruptive speech is, in fact, at its weakest because he spoke on his own time off campus about matters unrelated to school. To punish student expression, school officials must satisfy the "demanding standard" of showing that the expression caused actual disruption to learning at school or that administrators reasonably forecast such disruption—a standard that off-campus expression will rarely satisfy. *Mahanoy*, 594 U.S. at 189, 193.[2] School District administrators cannot satisfy that demanding standard here. No actual disruption occurred: In the nearly two weeks between the recording of O.J.'s rap lyrics and his suspension, Horace Greeley High School continued educating students

---

[2] This standard also allows for regulation of speech that "inva[des] the rights of others." *Mahanoy*, 594 U.S. at 188 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 513 (1969)). The invasion-of-rights standard might encompass "severe bullying or harassment targeting particular individuals" or "threats aimed at teacher or other students." *Id.* at 188. But O.J.'s lyrics were nothing of the sort. And the School District did not claim otherwise when suspending O.J., instead claiming that that it could reasonably forecast disruption because O.J.'s off-campus use of the words "faggot" and "twinks" might offend other students. Verified Compl. ¶¶ 122–24.

without incident. Nor did the School District reasonably forecast substantial disruption. Precedent makes clear that the mere use of offensive words is not enough to forecast substantial disruption from off-campus speech, particularly when the words do not target, concern, or even mention the school or anyone in it.

### 1.   School officials cannot punish off-campus speech except in rare circumstances.

Both the Supreme Court and the U.S. Court of Appeals for the Second Circuit require schools and courts to distinguish students' speech at school from their speech off campus. Students' on-campus speech can be regulated when the expression would "substantially disrupt" classwork or cause school administrators to reasonably forecast a substantial disruption. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 513–14 (1969).[3] But as *Mahanoy* clarified, school officials only receive "First Amendment leeway" to regulate speech at school because of schools' "special characteristics"—in particular, that school officials stand *in loco parentis* (in the place of parents) during the school day. *Mahanoy*, 594 U.S. at 187, 189; *see also id.* at 196–201 (Alito, J., concurring) (observing that, on campus, teachers must have "the authority to speak without interruption and to demand that students refrain from interrupting one another").

---

[3] Beyond *Tinker's* "substantial disruption" standard, the Supreme Court has permitted schools to generally regulate only three specific categories of *on-campus* student speech: speech that promotes illicit drug use, bears the imprimatur of the school, or is sexually explicit. *Mahanoy*, 594 U.S. at 187–88 (citing, respectively, *Morse v. Frederick*, 551 U.S. 393, 409 (2007), *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988), and *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986)). The *Tinker* standard applies to all other on-campus student speech. *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 325–26 (2d Cir. 2006) (holding that school could not punish student for t-shirt depicting a martini glass and lines of cocaine next to George W. Bush because it caused no disruption at school).

By contrast, schools' leeway to regulate vulgar student speech is "weakened considerably" when the speech is delivered "outside the school context." *Id.* at 192 (quoting *Morse v. Frederick*, 551 U.S. 393, 405 (2007)). While *Tinker*'s "demanding standard" requiring actual or reasonably forecast substantial disruption applies to both on- and off-campus speech, off-campus speech will seldom satisfy that standard. *Mahanoy*, 594 U.S. at 189, 193. *Mahanoy* warned that courts must be "more skeptical" of schools' attempts to punish students' off-campus speech because: (1) school administrators "rarely" stand *in loco parentis* concerning off-campus speech; (2) students have an overriding interest in not having their speech under a school's 24/7 control; and (3) schools, as "nurseries of democracy," have their own interest in instilling the importance of protecting unpopular expression. *Id.* at 189–190. Reviewing these factors, the Supreme Court determined that the *Mahanoy* cheerleader who wrote "Fuck school fuck softball fuck cheer fuck everything" in a social media post to other students, even though disturbing some at school, could not be punished because she had "spoke[n] outside the school on her own time." *Id.* at 185, 192–95.

For over 40 years, the Second Circuit has similarly restricted schools' control over students' off-campus speech. *See Thomas*, 607 F.2d at 1050 (protecting vulgar student publication because most of the publication efforts occurred "beyond the schoolhouse gate" where the "freedom accorded expression is at its zenith"); *see also Doninger ex rel. Doninger v. Niehoff*, 527 F.3d 41, 50 (2d Cir. 2008) (applying *Tinker*

standard to off-campus speech). Both the Supreme Court and Second Circuit require heightened skepticism of schools' attempts to regulate off-campus student speech.

That same skepticism is warranted here. O.J. engaged in freestyle artistic expression in a friend's bedroom on a Friday evening. He was outside school, at a time and place where he answers to his parents. And unlike the student in *Mahanoy*, O.J. played no role in sharing his artistic expression with others outside of his friend's bedroom.

The School District must therefore clear the high bar of demonstrating actual or reasonably foreseeable substantial disruption to justify punishing O.J.'s off-campus speech. The record here—no lyrics related to school, three isolated complaints, and no disruption or reasonably foreseen disruption—falls far short.

## 2.  The School District experienced no substantial disruption due to O.J.'s lyrics.

The School District has never claimed that O.J.'s lyrics caused substantial disruption at Horace Greeley High School. Nor could it. Substantial disruption is more than "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. It is the substantial disruption of "classwork" or "discipline in the operation of the school." *Tinker*, 393 U.S. at 513. Substantially disruptive speech is that which "will lead to a decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school." *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 674 (7th Cir. 2008). When a school "continue[s] to operate normally" notwithstanding the off-campus speech, then the speech caused no substantial disruption. *Thomas*, 607 F.2d

at 1052 n.17 (finding no substantial disruption when, for example, "schoolwide examinations were held without incident").

The record here offers even less evidence of disruption than in *Mahanoy*, where the Supreme Court overturned the cheerleader's punishment. *Mahanoy*, 594 U.S. at 194. There, class discussion of the student's social media post intermittently disrupted an algebra class over a couple of days. *Id.* at 192. In addition, several cheerleaders and students were "visibly upset" and complained to coaches. *Id.* at 185, 192. On that record, the Supreme Court found "no evidence" of substantial disruption or harm to the rights of others. *Id.* at 193; *see also C1.G ex rel. C.G. v. Siegfried*, 38 F.4th 1270, 1274, 1278–79 (10th Cir. 2022) (holding that classroom discussion and parent and student complaints, about off-campus social media post captioned "Me and the boys bout to exterminate the Jews," did not meet *Tinker*'s standard).

Here, the School District punished O.J. on an even thinner record. It has never claimed that discussion of O.J.'s lyrics consumed any class time whatsoever—let alone the intermittent classroom discussion that *Mahanoy* held did not constitute substantial disruption—or that O.J.'s lyrics otherwise actually disrupted classwork. The School District has only ever pointed to two anonymous website reports and a single in-person student complaint. *See* Verified Compl. ¶ 147. Even if the School District could show that O.J.'s lyrics had "upset" three students and taken up some class time, *Mahanoy*, 594 U.S. at 192, that would still fall short of the substantial disruption necessary to punish a student's off-campus speech. *See id.*; *see also id.* at

210 (Alito, J., concurring) ("Speech cannot be suppressed just because it expresses thoughts or sentiments that others find upsetting . . . .").

The absence of disruption flowing from O.J.'s speech also stands in sharp contrast to the facts in *Leroy v. Livingston Manor Central School District*, No. 21-CV-6008 (NSR), 2024 WL 1484254 (S.D.N.Y. Apr. 5, 2024) (Roman, J.). In *Leroy*, during jury deliberations for the murder of George Floyd, a student posted to social media a photo featuring another student kneeling over him, captioned with "Cops got another." *Id.* at *2. The post led to the following series of events at school the next day: students and teachers discussed the incident during classes, the school held an assembly to discuss the incident, students held a protest after the assembly, students further discussed the photo after the protest, and state troopers remained on school grounds throughout the day. *Id.* at *2–3, *9. On that record, this Court held *Tinker's* substantial disruption standard was met. *Id.* at *9.

In O.J.'s case, no class or assembly time was devoted to discussing his lyrics (or any other part of the song). No protest occurred. No state troopers were called in. Rather, in the weeks after O.J. improvised lyrics at a friend's house, administrators fielded three complaints about the song, two anonymously written. The record in this case pales in comparison to *Leroy* and even to *Mahanoy*. The School District cannot satisfy *Tinker's* demanding standard of actual "substantial disruption" because none occurred.

3.      **The School District could not reasonably forecast substantial disruption due to O.J.'s lyrics.**

Nor could the School District reasonably forecast that O.J.'s lyrics would substantially disrupt school. An "undifferentiated fear or apprehension of disturbance" cannot overcome a student's First Amendment rights. *Mahanoy*, 594 U.S. at 193 (quoting *Tinker*, 393 U.S. at 508). In determining whether a forecast of substantial disruption was reasonable, courts look at whether it was foreseeable that the off-campus speech would make its way onto campus and that, on arrival, it would risk substantially disrupting the school environment. *Doninger*, 527 F.3d at 48.

Here, the verified facts demonstrate that School District administrators punished O.J. only because of their "undifferentiated fear" that the words "faggot" and "twinks" would cause substantial disruption. *See, e.g.*, Verified Compl. ¶¶ 109, 115–24. In fact, the School District had even less support for reasonably foreseeable disruption than the record found wanting in *Mahanoy*. For example, unlike O.J.'s speech, the cheerleader in *Mahanoy* aimed expletives specifically at "school" and "cheer." *Mahanoy*, 594 U.S. at 185. Also unlike O.J., the cheerleader affirmatively shared her social media post with fellow students. *Id.* And while school officials believed the cheerleader's derogatory speech would negatively affect team cohesion based on student complaints to coaches, the Court viewed this as the sort of "undifferentiated fear" that could not justify suppressing students' off-campus speech. *Id.* at 193; *see also, e.g.*, *Thomas*, 607 F.2d at 1045, 1052 n.17 (invalidating punishment even though administrators believed off-campus expression "might offend or hurt others" at school).

School District administrators' concern that O.J.'s off-campus use of the words "faggot" and "twinks" would offend students on campus is the same sort of undifferentiated fear—especially because he identifies as part of the LGBTQ community. O.J.'s rap lyrics made no mention of his school or his classmates or his teachers. His lyrics were satirical, sophomoric, and referenced only his own identity. School District administrators are entitled to their opinion that the ironic use of the word "faggot" *by* an LGBTQ person is no different than the denigrating use of the term *against* an LGBTQ person. They are also free to misconstrue "twinks" as a slur. But administrators cannot punish students for off-campus speech based solely on their view of what offends. School District administrators pointed to only three complaints about the speech. Verified Compl. ¶ 147. It was not reasonable to believe that O.J.'s mere utterance of these words would cause a substantial disruption.

Other cases have similarly held that the offensiveness of off-campus speech does not provide grounds to reasonably forecast substantial disruption on campus. For example, the Tenth Circuit held that the First Amendment prevented school punishment for a student's off-campus social media post of a photo with his friends with the caption "Me and the boys bout to exterminate the Jews." *C.G.*, 38 F.4th at 1274, 1282. The consequences that school officials cited to justify suspending the student—four parent emails, a student worried about having a class with C.G., and a school discussion during one advisory period—did not support a reasonable forecast of substantial disruption. *Id.* at 1278–79. The Tenth Circuit reasoned that the student had spoken outside of school hours and did not identify or target his school or

members of the school community. *Id.* at 1278. If that was not enough evidence of disruption, then the facts here—three complaints and a generalized fear that O.J.'s lyrics might offend—are far from portending substantial disruption. *See also, e.g.*, *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 921 (3d Cir. 2011) (en banc) (finding lack of foreseeable disruption from parody social media profile that described the principal as an "oh so wonderful, hairy, expressionless, sex addict, fagass, put on this world with a small dick PRINCIPAL").

Indeed, the facts on the ground demonstrated that disruption was *unlikely*: School District administrators suspended O.J. almost two weeks after the recording date, when the song had already been deleted from SoundCloud, and without any disruption having occurred in the interim. The Second Circuit's decision in *Thomas* illustrates the point. There, a high school punished students that had produced a satirical newspaper off campus. *Thomas*, 607 F.2d at 1045–46. The newspaper contained articles "saturated with distasteful sexual satire" poking fun at "school lunches, cheerleaders, classmates, and teachers." *Id.* at 1045 & n.3. But at the time school officials suspended the students, the newspaper had already been distributed and still the school had "continued to operate normally." *Id.* at 1052 n.17. Holding the punishment violated the First Amendment, the Second Circuit rejected administrators' after-the-fact "predictions" of substantial disruption that had already been "convincingly repudiated" by an actual lack of disruption. *Id.*

As in *Thomas*, School District administrators made clear that they punished O.J. because his off-campus speech could offend others. *See, e.g.*, Verified Compl.

¶¶ 124, 136. Also as in *Thomas*, any claim of foreseeable disruption is belied by the record. By the time administrators suspended O.J. on October 19, the song had already been removed from the internet, almost two weeks had passed since his October 7 freestyle rap session, and all the while no disruption to the classroom had ensued. At that point, any supposed predictions of disruption had been "convincingly repudiated" by the reality of no disruption.

In contrast to the record in O.J.'s case, the Second Circuit's decision in *Doninger* further demonstrates the high bar to reasonably forecast substantial disruption from off-campus speech. There, a junior class secretary sent a mass email that falsely accused administrators of canceling a student-run battle-of-the-bands and encouraged people to complain to administrators. *Doninger*, 527 F.3d at 44–45, 51. Administrators received a "deluge" of phone calls and emails upset about the purported cancellation. *Id.* The junior class secretary then repeated her false claim on her public blog, resulting in students becoming "all riled up" and threatening a sit-in. *Id.* at 51. The Second Circuit upheld the school's punishment barring her from future student office because her blog post—directed at the school community and designed to recruit other students to "piss [administrators] off"—created a foreseeable risk of substantial disruption. *Id.* at 50–53.

The Second Circuit emphasized, however, that it was not deciding whether punishment more serious than disqualification from student government would "raise constitutional concerns." *Id.* at 53. And it cautioned courts and schools to "draw a clear line" between off-campus expression that "affects matter of legitimate concern

to the school community" and expression that does not legitimately concern the school. *Id.* at 48.

School District administrators failed to draw that line here. O.J.'s speech did not target the school community, let alone encourage others to harangue administrators. He did not facilitate a student protest or a "deluge" of phone calls and emails. School District administrators ignored *Tinker*'s demanding standard and suspended him anyway. Therefore, O.J. is likely to succeed on the merits: the dominant, if not dispositive, factor for O.J.'s request for a preliminary injunction. *N.Y. Progress*, 733 F.3d at 488.

## II.   O.J.'s Loss of First Amendment Rights and the Suspension's Impact on His College Applications Constitute Ongoing Irreparable Harm.

Having shown likely success on his First Amendment claims, it follows that O.J. will suffer irreparable harm absent injunctive relief because "the deprivation of First Amendment rights is an irreparable harm." *Agudath*, 983 F.3d at 637 (holding, in a First Amendment case, that no further showing of irreparable harm is required). A "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). O.J. is actively self-censoring his expression and even discussion of his own LGBTQ identity to avoid the potential for further punishment under the "hate speech" policy. Verified Compl. ¶¶ *Id.* ¶¶ 160–61, 166–67, 203. O.J.'s irreparable harm is presumed because his constitutional rights have been and continue to be violated. *Agudath*, 983 F.3d at 637. No further showing of injury is required.

But O.J. does show more.  The suspension will irreparably harm O.J.'s college prospects because college applications require him to disclose the basis for school discipline. O.J. is planning to apply to college programs in the coming fall. Verified Compl. ¶¶ 169–70. Having been suspended for engaging in "hate speech" will negatively impact O.J.'s candidacy.[4] Only an injunction expunging his suspension before he is required to disclose it will allow him to avoid the irreparable harm to his college opportunities.

## III.   The Balance of Harms Favors a Preliminary Injunction.

The balance of harms also favors O.J. In assessing this factor, the Court assesses the interests of the public and the relative harms to each party. *Hartford Courant Co. v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021). To start, "securing First Amendment rights is in the public interest." *N.Y. Progress*, 733 F.3d at 488. And as discussed, the School District's unconstitutional sanctions for his speech have resulted in significant harm to his ability to express himself and to his prospects for getting into college. The School District, however, "does not have an interest in the enforcement of an unconstitutional law." *Id.* (*quoting Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)). Because the School District's suspension violates the First Amendment, the balance of harms tips decidedly in O.J.'s favor.

---

[4] Indeed, colleges have rescinded offers of admission after discovering students had engaged in hateful speech. *See, e.g.*, Greta Anderson, *Students' Hateful Speech Results in Rescinded Acceptance*, Inside Higher Ed (June 4, 2020), https://perma.cc/C6VK-DEHV.

**IV.    The Court Should Waive the Bond Requirement.**

The Court should not require that O.J. post a bond. First, Federal Rule of Procedure 65(c) only requires that a preliminary-injunction movant post security in an amount "the court considers proper" to cover damages of a party found to be wrongfully enjoined. Fed. R. Civ. P. 65(c). In the absence of proof of likely harm to the enjoined party, the rule requires no bond. *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974). The School District has not identified any harm rectified by suspending O.J. *See* Verified Compl. ¶ 121. Second, bond requirements should be waived when the litigation is "in the public interest." *Pharm. Soc. of. State of N.Y., Inc. v. N.Y. State Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995). Because advancing First Amendment rights is in the public interest, *N.Y. Progress*, 733 F.3d at 488, this Court should not require O.J. to post bond.

<b>CONCLUSION</b>

The First Amendment does not give School District administrators unfettered discretion to control student expression in all places and at all hours. And O.J.'s off-campus speech was unrelated to school and caused no actual or reasonably foreseeable substantial disruption at school. He therefore respectfully requests that this Court grant his motion for a preliminary injunction requiring the School District to remove the unconstitutional suspension from his student record.

Respectfully submitted,


Dated: May 31, 2024


*/s/ Colin P. McDonell*

Colin P. McDonell*                        Alanna Kaufman
Greg H. Greubel*                          Alyssa Isidoridy
FOUNDATION FOR INDIVIDUAL RIGHTS          KAUFMAN LIEB LEBOWITZ & FRICK LLP
    AND EXPRESSION                        18 E. 48th Street, Suite 802
510 Walnut Street; Suite 900              New York, NY 10017
Philadelphia, PA 19106                    Tel: (212) 660-2332
Tel: (215) 717-3473                       akaufman@kllf-law.com
greg.greubel@thefire.org                  aisidoridy@kllf-law.com
colin.mcdonell@thefire.org

*Admitted *pro hac vice*

    Counsel for Plaintiff O.J., through his father, M.J.